Filed 12/16/13  P. v. Salas CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F063978 |
| Plaintiff and Respondent, | (Super. Ct. No. F09903456) |
| v. | |
| BENITO SANCHEZ SALAS, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Edward Sarkisian, Jr., Judge.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Tiffany J. Gates, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

This case arises out of an altercation between members and friends of two families who lived in the 4600 block of East Turner Avenue, Fresno.[1] As of June 2009, Maria Arceli Mendez (Arceli) and her husband, Jose Mendez (Jose), lived at 4677 with their children, who included Esmeralda Mendez (Esmeralda), Jose Balderas, Ruben Balderas (Ruben), and Josue Balderas (Josue). The Salas family lived at the two addresses directly east of the Mendez residence. Benito Sanchez Salas (defendant), his daughter, and Rebecca Hernandez (Hernandez) lived in the guest house at 4681, next door to the Mendez home. Defendant's father Alberto Salas, Sr. (Alberto), mother Maria Nativad Sanchez (Maria Nativad), and brother Jose Salas (Sam) lived in the main house at that address. Defendant's brother Antonio Sanchez Salas (Antonio) and Antonio's son Junior Jesse Salas (Junior Jesse) resided at 4687, the house immediately east of 4681. Defendant's brother Fabian Salas (Fabian) was staying at 4687 at the time. Defendant also had three other brothers: Miguel Salas (Miguel), Alberto Salas, Jr. (Junior), and Santos Salas (Santos).

On June 11, 2009, family and friends gathered at the Mendez residence for a barbecue. A fistfight broke out between some of the Mendezes and some of the Salases, then gunfire erupted. As a result of these events, a jury convicted defendant of the first degree murders of Jose and Pablo Mendez (Pablo) (Pen. Code,[2] § 187, subd. (a); counts 1 & 2, respectively), and the attempted premeditated murders of Eulalia Mendez (Eulalia) and Juan Mendez (Juan) (§§ 187, subd. (a), 664; counts 5 & 6, respectively).[3] As to

---

[1]    For the sake of clarity and brevity, we refer to the addresses involved by number only. We also refer to certain individuals by their first names or the names by which they are commonly known. No disrespect is intended.

[2]    All statutory references are to the Penal Code.

[3]    The second amended information erroneously stated Eulalia's first name as Eulabia. Juan was referred to throughout trial as Johnny Mendez.

counts 1 and 2, jurors found true a multiple-murder special circumstance. (§ 190.2, subd. (a)(3).) As to all counts on which they convicted defendant, jurors found defendant personally and intentionally discharged a firearm. (§ 12022.53, subd. (c).)[4] Defendant's new trial motion was denied, and he was sentenced to two consecutive terms of life in prison without the possibility of parole, plus two consecutive terms of life in prison with the possibility of parole, plus 80 years. He was also ordered to pay restitution, as well as various fees, fines, and assessments.

On appeal, we hold the evidence was sufficient to support the jury's verdicts, and defendant could properly be convicted of homicide even after the jury deadlocked, and a mistrial was declared, with respect to Antonio. Accordingly, we affirm.

**FACTS**[5]

**I**

**PROSECUTION EVIDENCE**

As of June 2009, the Mendez and Salas families had been neighbors for years.[6] There had been no problems between the two groups until late 2008 or early 2009, when Ruben began to have problems with Fabian and Antonio. On March 8, a fight that began between Fabian and Ruben ended with defendant hitting and kicking Jose, and Ruben

---

**4**  Defendant was acquitted of the attempted premeditated murder of Anabel Vargas (Vargas), as charged in count 4.

Antonio was jointly charged with defendant in counts 1 and 2, and was alleged to have personally and intentionally discharged a firearm, proximately causing death. (§ 12022.53, subd. (d).) Antonio alone was charged, in count 3, with the attempted premeditated murder of David Plascencia (Plascencia). He was not charged in counts 4 through 6. He was jointly tried with defendant, but the jury was unable to reach a verdict on any of the charges against him, and a mistrial was declared.

**5**  Although some witnesses did not know the names of the members of the Salas family, we have added those names where they have been established by other evidence.

**6**  Undesignated dates in the statement of facts are to the year 2009.

being hospitalized after Antonio struck him in the head. The police were called. Although no arrests were made, Arceli unsuccessfully attempted to get a restraining order against defendant, Fabian, and Antonio. After that, the Salases — particularly Fabian — always tried to start trouble. The Mendezes called the police multiple times as a result.

June 11 was elementary school graduation for Esmeralda and Junior Jesse. Arceli, Jose, Ruben, Jose Balderas, and Fabian all were present at the ceremony. Afterward, Fabian approached Ruben and they argued, with Fabian calling Ruben names and saying something along the lines that he was going to kill Ruben or Ruben should "watch" when he got home. Arceli called the police and Fabian accused her of being a snitch.

The Mendez family drove home in separate vehicles. When Arceli and her children arrived, Fabian and his parents were in front of the Salas home, but they did not say anything to Arceli. When Jose arrived, however, Fabian started insulting him and saying things like, "I'm going to fuck you guys all up. You guys are done." Jose refused to fight Fabian and told him to calm down, and Arceli again called the police. The police talked to both families, then left. Fabian again started yelling at the Mendezes from his house, calling them names and trying to get them to come outside.

Vargas arrived at the Mendez house around noon. Fabian was on the front porch at 4681, cursing and saying "disturbing" things. At one point, he waived a gun around and told Jose it was for him. Arceli called the police again. The officers talked to the Salases, then told Arceli everything was going to be fine, her family should continue with the barbecue they had planned, and the police would be patrolling the area.

The Mendezes went into the backyard and started barbecuing for Esmeralda's graduation party. Family members and friends arrived at different times and went to the back to eat. During the two hours before the shootings, Vargas saw more and more people arrive at the Salases' location, and heard the Salases — particularly Fabian — trying to provoke Jose.

4.

After people ate, many went to the front yard to talk and watch the children play. Accounts of what happened next varied.

Pablo's wife, Maria De Jesus Mendez (Maria De Jesus), saw Alberto and Maria Nativad arrive in a van. Maria Nativad got out, took out a gun, and gave it to one of the young men. The young man loaded the weapon and pulled back the top. Jose said to fight fair and not pull any guns. Vargas saw Alberto arrive in a van. He had something in a paper bag. From the way he carried it, Vargas surmised the bag contained guns. Alberto put the bag in the bed of Santos's brown mini truck.[7] Vargas yelled at Jose to come back, that they had guns, but she did not believe he heard her. Ruben saw Alberto pull up in a van. He had a black plastic trash bag. Antonio, who already had a gun, and defendant went to Alberto's location. When they came back out front, defendant had a gun.[8]

Others first saw guns appear just before or during the time Fabian, possibly several other Salases, Jose, Pablo, and Juan walked out into the street, and Fabian and Jose started arguing. Ruben saw Antonio pointing a gun at everyone during the argument. Juan, who got in front of Jose as they walked into the street, saw more than one gun, and a gun being passed around. Johnny Mendez, Jr. (Johnny) saw Fabian pull a gun out of a truck. Fabian passed the gun to Antonio, and Antonio pulled back the slide. Fabian told him no. Fabian was putting the guns away, and Juan said to put the guns down and fight like a man or something to that effect. Fabian said, "fine, we'll fight," then handed the gun to Antonio, who left for a while.

---

**7** When interviewed by Detective Gray, Vargas said she saw the bag passed to Santos, who pulled out guns and passed them to someone else.

**8** Arceli also testified to seeing Alberto drive up in a van and get out holding a black garbage bag she suspected contained guns. However, she said this happened right after the police left after the first time she called them from the house.

Fabian lunged toward Jose, the two started fighting, and others joined in. Shortly after the fight started, shots were fired.

According to Hernandez, Antonio was inside his house until after the shootings, when he exited the residence and walked off. After the fight started, defendant shot into the air about four times as he walked toward the crowd, where Fabian and Miguel (who had intervened in the fight on Fabian's behalf) were on the ground with a crowd of about 13 other men beating them up. As defendant started walking toward the street, the Mendez family moved toward him. They looked angry. They surrounded him, then he fired and two people who were part of that group dropped to the ground.[9]

According to Arceli, Jose was on top of Fabian when Antonio came from one side, shot Jose, and then shot Pablo. Defendant then moved closer and Antonio handed him the gun. Defendant immediately began firing "at all the people." Antonio got on a bicycle and left. While defendant was firing, Maria Nativad was yelling at her sons to kill everybody, even the mother, and not to let anybody live.

Christina Acosta (Acosta) saw Fabian hovering over one of the Mendezes, hitting him, when defendant, who had a gun, ran from the area of the gate at 4681 to the street. He was "shooting all over the place" as he ran. He first aimed toward the middle of the street, then fired in different directions. When he reached the middle of the street, he stopped running and fired more shots. Defendant was the only person Acosta saw with a gun, although she heard shots before she saw him shooting. She did not see anyone give him a gun. She did not see Antonio at the scene.

According to Jose Balderas, Antonio fired at least two shots toward Jose and Pablo. He was six or seven to 10 feet from Jose at the time he fired. Pablo was a couple

---

[9] When interviewed by Gray, Hernandez consistently said she did not see anyone with guns or the shooting. Gray told her that if the shooting was self-defense, she should tell him and explain what happened. She never gave any explanation.

of feet behind Jose. Jose Balderas ducked down behind a car. He saw Antonio ride off on a bicycle, but, although he only saw the one gun, he continued to hear shooting after Antonio was gone.[10]

Emmanuu Sandoval (Sandoval) told Detective Federico that he saw three firearms at the scene. Antonio was waving a gun as he came running from his house, and defendant and Junior also had firearms. Antonio, who was several feet away from Jose, pointed at Jose's head and shot him. Sandoval surmised Antonio also shot Pablo, because Pablo and Jose fell at the same time. Sandoval said guns were handed to Miguel and defendant. After Jose and Pablo fell, Sandoval hid between two cars and heard several more gunshots. He gave the impression there were multiple weapons being fired at the same time.

According to Ruben, defendant shot Jose. Ruben did not remember how many times defendant fired, but "it was a lot." He was not able to see what Antonio was doing while defendant was firing.[11]

Juan was face down on the ground when he heard three shots and then a big boom. He looked up and saw people running everywhere and Pablo lying next to him. As he was getting up, he saw someone pointing a gun at him. He looked the other way, heard a bang, and thought he was hit, but he was not. He did not recall if this person fired at him,

---

[10] Shortly after the shooting, Jose Balderas told Officer Alvarado that he saw Antonio fire approximately nine times, and that he did not see anyone else with a weapon. When interviewed by Gray later that night, Jose Balderas said he saw Antonio put the gun in his pocket and flee on a bicycle.

[11] When interviewed later the same day by Detective Byrd, Ruben said either defendant or Miguel (whom Ruben could not tell apart) shot Jose and Pablo. Asked specifically if he ever saw a handgun passed between Antonio and defendant, Ruben stated he did not.

but the person was firing toward all the people who were at Jose's house.[12]  Juan heard seven shots after that.

Johnny heard a gunshot and saw Jose fall.  When Johnny looked for the gun, he saw Antonio firing.  Antonio shot three times.  Johnny then moved over by Hector Balladares's (Balladares) vehicle.  He saw Balladares with a shotgun or rifle and heard him fire it.  Although he did not see where Balladares was aiming when he fired, he remembered Balladares standing with the gun by the door of his vehicle, aiming up.  Johnny then saw defendant, "in a panic," shooting randomly.  Johnny heard about seven shots fired after the shotgun.  He saw defendant fire the last two shots.  Defendant had a different gun than the one Johnny saw Antonio fire.[13]

Balladares retrieved his shotgun from his vehicle when he saw two people with guns.  He heard three shots, but did not see who fired them.  He heard someone say, "Shoot the mom" or "Get the mom," then saw defendant trying to shoot first Eulalia and then Juan.  Wanting defendant to stop firing, Balladares fired his shotgun up in the air.  Defendant was not the same person Balladares first saw with a gun.  Balladares heard six to eight shots after he fired his shotgun.[14]

During the argument in the street, Plascencia saw a man with a gun run to the street from the area of 4681 or 4687.  Jose told him to put the gun down, then Juan and another man started fighting.  The man with the gun moved to the sidewalk.  He had the gun hidden, but Plascencia knew he had it because he did not give it to anyone.  When

---

[12]  Arceli told Gray that defendant fired at Juan.

[13]  In his subsequent statement to law enforcement, Johnny said Antonio was the only person he saw firing, although he knew defendant also fired because he had been told that.

[14]  When shown photographic lineups containing defendant's and Antonio's pictures, Balladares said defendant was the person he saw on the news, and Antonio looked like the shooter.

other people jumped into the fight against Juan, Plascencia ran to try to separate them. As he did, he was shot in the side of the face. Although Plascencia did not see who shot him, he believed it was Antonio because Antonio was at the location that lined up with the shot, and he was the only one Plascencia saw with a gun.

Vargas observed one gun being put away, but another gun being taken from the mini truck and passed hand to hand, so it was moving to the front of the group of people associated with the Salases. Finally, one of that group fired three shots, then handed the gun to defendant, who was the person behind him. The person who fired first aimed each shot, whereas defendant "seemed like he was shooting ducks out there."[15] Defendant and Vargas made eye contact, and defendant swung the firearm toward her. She threw herself to the ground and heard the gun fire.

According to Eulalia, Antonio ran from 4681 with a pistol in his hand and shot Jose and Pablo. Eulalia saw and heard three shots, went to Jose, and then heard Maria Nativad say, "kill the mother." Eulalia saw defendant pointing a gun at her. He fired, she turned, and the shot went by her, between her shoulder and her ear.[16]

---

[15] Vargas did not know the Salases, although Jose had identified some of them for her earlier. During the incident, she concentrated on the clothing worn by the shooters. When interviewed by Alvarado shortly after the shootings, she said Antonio produced a firearm and began shooting at Jose. She believed Antonio fired about nine times, and may have handed the firearm to defendant, who also fired at Jose. She also said Antonio left the area on a bicycle. When interviewed by Gray, she described the person who fired the first three rounds as wearing a dark blue Polo shirt; he then handed the gun off to a person wearing a dark blue tank top, and the second person fired five times. Defendant was detained at the scene shortly after the shooting. He was wearing a dark blue tank top.

[16] Vargas recalled Maria Nativad pointing at Eulalia and stating "shoot the mom," but did not remember anyone firing in Eulalia's direction. However, Gray found physical evidence to support the idea that shots were fired at Juan and Eulalia as they tended to the victims.

According to Esmeralda, Jose and Fabian were on the ground, fighting, when Antonio came from the side and shot Jose and Pablo. Antonio was "very close" to Jose when he fired, hitting Jose in the head.[17] Antonio then left on a bicycle. Esmeralda did not know where defendant was when Jose was shot, but after, she saw defendant shooting at "everybody" on the Mendez side. Esmeralda did not see where defendant obtained his gun.[18]

Officer Taylor arrived on the scene three minutes after being dispatched to a call of men arguing. A number of people ran toward his patrol car, yelling that those involved in the shooting were still at the location. They led Taylor to one of the Salas residences and pointed out defendant and Miguel, who were standing in the front yard. Neither had a weapon. However, results of a gunshot residue examination subsequently conducted on defendant were consistent with him having fired a firearm.

Officer Ruiz conducted in-field showups on the evening of the shooting with Jose Balderas, Josue, Juan, and Ruben, in which each was shown defendant and Miguel. Jose Balderas said "Tony Salazar" was the shooter, defendant had encouraged Fabian to fight, and Miguel was also fighting.[19] Jose Balderas said he did not see defendant with a gun. The other three all identified defendant as the shooter. Ruben stated there was only one shooter and defendant was the person who shot Jose and Pablo. Juan identified defendant as the shooter and said defendant shot at him, but Juan ducked.

---

**17**   Esmeralda demonstrated the distance for Federico, who estimated it was nine to 11 feet.

**18**   In her call to 911, Esmeralda identified defendant as the person who shot Jose and Pablo. At trial, she explained it was really Antonio she saw; at the time of the shooting, she panicked and got Antonio's and defendant's names mixed up.

**19**   When shown photographs by Gray, Jose Balderas identified Antonio as the "Tony" who shot Jose and Pablo.

Autopsies revealed Pablo was shot in the left side of the head from a distance of more than two and one-half to three feet.  He also was grazed by a bullet on the left side back.  The cause of his death was "perforation of the brain due to gunshot wound to the head."  Jose suffered a penetrating gunshot wound to the left parietal region of the head.  The bullet was fired from a distance of more than two and one-half to three feet.  The cause of his death was "penetration of the brain due to gunshot wound to the head."

Two expended 10-millimeter shell casings were found in proximity to the porch area of 4681, then seven such casings in a group, then two more.  The existence of 11 expended shell casings indicated the weapon was fired 11 times.  Based on the physical evidence at the scene and his investigation, Gray concluded one handgun and one shotgun were fired during the incident.[20]

Gray listened to the Hernandez and Acosta 911 calls in which the shots could be heard.  The first and second shots were almost a second apart.  There was then a pause of just under one second, then a series of six shots, each separated by approximately one-quarter to one-half of a second.  There was then a pause of over 13 seconds between the eighth and ninth shots, just under two seconds between the ninth and 10th shots, slightly more than four seconds between the 10th and 11th shots, and just over six seconds between the 11th and 12th shots.  The shotgun blast was the 10th shot.  Gray determined it was physically possible to pass the gun to another person in the time span between the second and third shots.

A magazine from a Glock 10-millimeter handgun, and an empty holster that fit a Glock 10-millimeter handgun and in the pouch of which was a loaded magazine for the same type of firearm, were found in the living room of 4681.  A black nylon pouch containing a 10-millimeter magazine was found in one of the bedroom closets.  At 4687,

---

[20]     Numerous bullet strikes and bullet holes were found in structures west of the Mendez residence.  The shotgun was only fired once.

a pouch of the type used to hold a set of handcuffs, a plastic holster, and an open but lockable handgun case labeled "Glock" were found. A box of live nine-millimeter ammunition and a magazine for a Glock nine-millimeter handgun were in the gun case. In a box in the detached garage was a Glock nine-millimeter semiautomatic handgun that had one round in the chamber and five in the 10-round-capacity magazine, and that fit the holster found in the bedroom. The firearm was registered to Antonio. A Glock 10-millimeter handgun, that was subsequently determined to have been used to fire the 11 cartridge casings recovered from the scene, was found hidden in a woodpile behind the garage. This gun had a bullet in the chamber and three in the 15-round-capacity magazine.[21]

The 10-millimeter handgun belonged to Purdy Rivera (Rivera), defendant's employer. When Rivera saw on the news that defendant had been arrested for a crime involving a firearm, he checked the storage container in his office and discovered his gun, extra clips and ammunition, and holster were missing. Rivera could not recall whether defendant was employed on June 11, or if he was doing other things at the time because work was slow. However, defendant knew the firearm was in the storage container. Rivera did not give defendant or anyone else permission to take the gun. At one point, Rivera and defendant, whom Rivera knew was having problems related to his neighbors, discussed the gun, and Rivera told defendant that Nathan Hammer, another of Rivera's employees, might have it.

---

[21]    Bullet fragments recovered from various people and locations were either unsuitable for comparison, or shared rifling characteristics with bullets that were test fired from the gun, but, based on a lack of individual characteristics, yielded inconclusive results. However, the nine-millimeter gun that was found was excluded as having fired those bullets. For practical purposes, all the ballistic evidence at the scene came from the 10-millimeter Glock.

Gray and Federico interviewed Antonio a day or so after the shooting, when Antonio turned himself in after seeing on television that the police were looking for him. Antonio related that the Mendez sons, who were in high school, tried to beat up Junior Jesse, who was 12. Antonio talked to the father, who said he would talk to his son, and things "just went off from there." According to Antonio, the Mendez teenagers and their father then tried to beat up Fabian at Junior Jesse's graduation. Fabian telephoned Antonio, who had to work that day, to tell him what happened, but Fabian was not upset.

Antonio related that when he got home from work about 5:30 p.m., Junior Jesse came running in and said the Mendezes were "jumping" Fabian. As Antonio came outside to help Fabian, he heard 12 or 13 shots and what sounded like a shotgun.[22] He grabbed Junior Jesse and ran. He did not see anyone with guns or know, at the time, whether anyone was shot.

Antonio related that he had one weapon at his house — a nine-millimeter Glock that was locked in a box in the closet of his bedroom. He expressed surprise when told the gun was found at a different location, and said nobody in his household knew he had the gun, and he had the key to the lock. Antonio denied being involved in the altercation with the Mendezes, near the crowd of people fighting, or having a weapon in his hands. As far as Antonio knew, none of his brothers owned a gun.

## II

### DEFENSE EVIDENCE[23]

Stephen Cloyd testified as an expert regarding shotguns and ammunition. He concluded the location at which the wadding from Balladares's shotgun was found was

---

[22] Antonio once took classes to be a security guard.

[23] In light of the unified nature of the defense presented at trial by defendant and Antonio, we treat all defense evidence as having been adduced on behalf of defendant, regardless of who actually called the witness.

inconsistent with that gun having been fired up into the air. Rather, the shotgun was basically parallel to the ground and had to have been aimed toward the east.

On the night of the shooting, Josue was asked to view an in-field showup. He identified defendant as the person who shot Jose. He did not actually see defendant shoot Jose, he just saw defendant shooting, and that was why he thought defendant was the perpetrator.

After defendant was detained following the shooting, Josue attacked him and was arrested as a result. He told the arresting officer that defendant and Antonio had guns and were shooting, and that Antonio shot and killed Jose. Josue told the officer that he saw Antonio pull a chrome gun, possibly a .45, from an unknown location and begin shooting. The gun Josue saw in Antonio's possession was a different gun than the one he saw in defendant's possession.

Miguel did not reside on East Turner at the time of the shooting, but was aware of tension between the Mendez family and his, particularly Fabian and Ruben. So far as he knew, defendant never had any problems with the Mendezes. After the incident on March 8, however, defendant was frustrated and worried. On or shortly after that day, defendant and Miguel drove to the Sanger residence of Nathan Hammer, who gave defendant a shoe box containing a gun. Defendant took it home.

On June 11, Miguel went to his parent's house around 11:00 a.m. or noon, after he got off work. When he arrived, a police officer was talking to defendant and Fabian. Miguel remained at the house until around 1:00 p.m., then left.[24]

---

[24] According to Maria Nativad, she, Alberto, and Sam worked that day, harvesting oranges. They started at 6:00 a.m. and arrived home around noon or 1:00 p.m. They traveled in Alberto's van. That day, as they frequently did, they brought oranges home with them. One of them took the oranges inside in a plastic bag. At no time did Maria Nativad see Alberto with a bag full of guns.

14.

Miguel returned to his parents' house around 5:00 p.m. There was a large gathering at the Mendez house. Jose and Juan were calling Fabian names and cussing at him. Fabian responded by staring back at them. Seven or eight of the group at the Mendez house started walking toward the street. Fabian and Miguel responded by also going toward the street. Juan challenged Fabian to fight, and there was a lot of hollering back and forth. Antonio and defendant were not out there.

Fabian and Juan exchanged blows, and Fabian landed a hard one that made Juan step back. The others then rushed Fabian. Miguel saw someone with a knife, and so he ran to try to get people off of Fabian, who was on the ground. Miguel struck Jose, then was himself hit in the back of the head. Miguel was on the ground near Fabian when he heard rapid shots. He did not know how many. He did not see who was shooting, and had not seen anybody with a gun. Everyone, including Miguel, ran.

Miguel ran to Antonio's house. He did not see Antonio or Junior then, but defendant came inside when Miguel was already there. Miguel did not hide a gun. He did not know what defendant may have done.

Defendant testified that on March 8, he was at a grocery store when he got a phone call that something was happening at the house. When he arrived home, he saw Alberto and Antonio shaking hands with Jose. Defendant did not find this unusual, because they had had arguments before, then would discuss it and shake hands.

Defendant was sitting on the porch when he saw a group of youngsters coming from across the street, and observed words being exchanged between Fabian, Ruben, and Sandoval. Those three suddenly got into a fistfight. Jose threw a beer bottle at defendant, who by this time was standing next to Alberto, and defendant and Antonio became involved in the fight. Defendant hit Jose and knocked him down. Jose started making threats and saying he was going to kill Fabian, and he also mentioned Alberto,

15.

Maria Nativad, and defendant.[25]  The next day, when Jose was sober, he came over and apologized to Alberto.

After the incident, defendant pleaded with the responding police officer to arrest both him and Jose, so they could resolve their issues, but the officer would not. Defendant subsequently telephoned Rivera, then drove to his house with Miguel. Defendant explained the situation, and asked if Rivera thought it would be wise for defendant to obtain a gun.  Rivera thought it would be, and offered to lend defendant his firearm.  Rivera said Nathan Hammer had it at his residence, so defendant and Miguel drove to Sanger and got the gun.  Defendant and Miguel returned home, and defendant put the gun in the guest house and then later hid it in a cabinet in Maria Nativad's kitchen.  No one else knew where it was.

On June 11, defendant had to take care of some errands.  He did not know about the elementary school graduation.  When he arrived home, he talked to Fabian about what had gone on at the school.[26]  The police arrived and talked to Fabian and members of the Mendez family, but did not do anything.

---

[25]    Defendant had never seen Jose with a weapon, but had heard shots next door. According to Maria Nativad, Jose frequently shot from his side of the dividing fence, near her bedroom window.

[26]    As Fabian was leaving the school after the graduation ceremony, he ran into Jose, Ruben, and some other members of the Mendez family.  Ruben said something about beating Fabian, who gave him a smirk and left.  Fabian did not think it was the place to start anything, so he told Junior Jesse to go with him.  When Junior Jesse did not want to go, Fabian left him there.  The Mendez family almost walked Fabian to his car, as if they were escorting him.  When he got home, he went to 4681 and told Alberto what had happened.  Fabian was angry, because it had been his nephew's graduation and the Mendezes had "intimidated [Fabian] out of the school."  Fabian, who admitted having a temper and being known for fighting a lot, told his father that he wanted to fight Jose.

Fabian was in his yard when "carloads" of people arrived.  He was getting threatened, and Jose was walking around in his front yard with a towel on his hand, acting like he was going to shoot Fabian and saying he was going to shoot them.  Fabian

16.

Later that afternoon, defendant saw a lot of males next door to 4681. This concerned defendant, because only his parents and Sam, who is somewhat slow mentally, lived in the front house. Defendant entered his parents' house and encountered Alberto coming out of his bedroom. He was on the telephone, and handed it to defendant. Al Alarcon, who owned a real estate and construction business and had been acquainted with the Salas family and advised Alberto for years, was on the phone. He advised defendant to go to the courthouse and take out some restraining orders against the Mendezes.

Defendant walked outside while still on the phone, and saw 40 people he believed were coming to kill Alberto. The group was walking toward the driveway at 4681. Defendant saw Fabian in the middle of the street with seven to eight people around him. They were arguing, and it appeared they were getting ready to fight. Defendant did not see anyone with a weapon at that point, and he walked out to where they were going to fight. As he got closer, he noticed a Hispanic male with what defendant believed to be a rifle, walking by the cars.[27]

Afraid Fabian would be killed, defendant ran to 4681 and grabbed the gun out of the kitchen cabinet. He chambered a round and ran back outside, firing two or three shots into the air as he went. He ran to the location he believed allowed him the best chance of finding the person with the rifle, and he saw Fabian getting beaten up. Defendant fired at Jose and another individual who were kicking Fabian. Defendant believed he fired five to six rounds at those people, although he did not know how many exactly. He "was just shooting."

---

did not see a gun at that time, although he had seen Jose with a gun before. Fabian spoke to defendant, then called the police and told them he wanted it resolved.

[27]    Defendant explained that he was not familiar with guns and could not distinguish shotguns from rifles.

After defendant fired the first five or six shots, he told everybody to get back. He panned the gun so people would know he meant business. He did not want anyone around him, because he was looking for the man with the rifle. People stayed away from him.

As defendant was panning the gun, he saw the man with the rifle. The man came from behind Balladares's truck, lifted the rifle, and fired it defendant's way. Defendant fired three or four times in that direction. He may have fired one or two more shots after that. As far as he was aware, he never fired at Vargas, Eulalia, or Juan. He never directed any of his shots into the Mendez yard or at the Mendez house. He had no idea at the time that Plascencia had been hit.

Defendant believed that had he not started shooting, Fabian would have died. Defendant had no idea where Antonio was at the time. There was "no way" Antonio could have had Rivera's gun; to defendant's knowledge, Antonio did not even know defendant had the gun.[28]

After the shooting, defendant ran to Antonio's house and hid the gun in back of one of the garages there. He did not see Antonio any time during the incident. Defendant came back out into the front yard when the police officers arrived and turned himself in. He did not tell officers that he had to defend his brother. When asked what he saw, he gave "a bunch of bullshit."[29]

---

[28] According to Maria Nativad, Antonio was not on good terms with the rest of the family at this time. Although he was welcome at his parents' home, he would not go there.

[29] Officer Jaime was assigned to watch defendant after defendant was detained. Defendant related that he was in the backyard when he was told someone was fighting with Fabian. He went to the front yard and saw seven Hispanic males beating one Hispanic male who was lying on the street. Defendant said he did not know who the person was, and did not know who was fighting because everything happened so fast, but it could have been Fabian. Defendant said nothing about Fabian getting killed or thinking he had to run out there with a gun to save his life. Although he mentioned

18.

Antonio testified that in approximately 2007 or 2008, he purchased a nine-millimeter Glock semiautomatic firearm from a store in Fresno because he was planning to be an armed security guard. The gun came in a lockable box with two magazines. Antonio also bought ammunition, handcuffs, and a handcuff case. Antonio kept the gun in his bedroom closet. He did not store it loaded.

On March 8, Alberto talked to Jose, then called Antonio, who was at Antonio's house, over.[30] Antonio and Jose talked, and Jose said he would talk to his son, and Antonio should talk to Antonio's son. Antonio and Jose were shaking hands; in Antonio's mind, everything was settled. However, he then saw Ruben and Sandoval walking toward Sandoval's house, and Fabian coming. Ruben, Sandoval, and Fabian started arguing, then fighting. Antonio started to walk over to them, but Jose's friend grabbed and held him, and Josue came from the side and hit Antonio with brass knuckles. Antonio freed himself, then hit Ruben on the side of the head.

Between March 8 and the day of the shooting, Antonio did not have any further problems with the Mendez family. He never displayed his gun to, or pointed it at, any of them.

On June 11, Antonio was unable to go to Junior Jesse's elementary school graduation, because he had to work. Fabian went in his place. Fabian subsequently telephoned Antonio and said he was having problems with the neighbors at school, and

---

Fabian having a problem with the neighbors, he said nothing about his parents being threatened by them. Defendant said he did not see anyone fire a handgun. However, a shot was fired in his direction by a Hispanic male with a black shotgun, who first pointed the shotgun at the group of males in the street. Defendant told Jaime he did not recall exactly what happened because it happened fast.

[30]     The only issue Antonio had had with a member of the Mendez household as of this time was Ruben arguing with Junior Jesse on one occasion. When Antonio asked what the problem was, Ruben said he was just teasing Junior Jesse. Antonio asked Ruben to please leave Junior Jesse alone, and Ruben said he would.

19.

that they had tried to jump him. Fabian wanted Antonio to come home, but Antonio could not, and he told Fabian just to stay inside.

During the course of the day, Fabian probably called Antonio three times. During one of the calls, Fabian said there were a lot of people over there, starting trouble with him. Antonio, who still could not leave work, again told him to stay inside.

Antonio finally got home around 5:30 p.m. At some point, Junior Jesse came running in and said "they" were jumping Fabian. Antonio assumed he meant the Mendezes, because Fabian was having problems with them. Because he had seen a lot of people when he arrived home, Antonio grabbed his gun from its unlocked box, stuck in one of the magazines, and started outside. As he was running from his house with Junior Jesse behind him, he heard shooting. When Antonio actually got outside, he saw a group of people and smoke. He did not see who shot or know if anybody got shot. He threw his gun in the garage, then he and Junior Jesse jumped the fence and took off. Antonio did not stay to find out what was going on, because there were a lot of people and he did not know who was shooting. He was scared and did not want his son to get hurt. He dropped the gun because he did not have a permit to carry it as a concealed weapon and did not want to be carrying it around. The next day, someone told Antonio that they had seen on television that the police were looking for him. Antonio promptly turned himself in.

Antonio denied shooting anyone or passing a gun to defendant. Antonio and defendant "didn't talk." If they saw each other, Antonio would merely wave. They did not have any kind of relationship, and Antonio was unaware defendant had a gun. Shooting someone did not seem like something defendant would do.

# DISCUSSION

## I

## SUFFICIENCY OF THE EVIDENCE

Defendant contends his convictions must be reversed, or at least reduced, because (1) there is insufficient evidence of specific intent to kill, as required to sustain the attempted murder verdicts, and (2) there is insufficient evidence to support the jury's findings of premeditation and deliberation with respect to all the verdicts.

The governing legal principles are settled. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

With these principles in mind, we examine defendant's claims.

21.

## A.     Intent to Kill

"An attempt to commit a crime occurs when the perpetrator, with the specific intent to commit the crime, performs a direct but ineffectual act towards its commission. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 36.)  Attempted murder "'requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 739.)  Implied malice — a conscious disregard for life — does not suffice, even though it would for murder itself.  (*People v. Stone* (2009) 46 Cal.4th 131, 139-140; *Smith*, *supra*, at p. 739.)

A defendant's intent is rarely provable by direct evidence.  Rather, such intent "'must usually be derived from all the circumstances of the attempt, including the defendant's actions.  [Citation.]'" (*People v. Smith, supra,* 37 Cal.4th at p. 741.)  This is so even with respect to the intent to kill (express malice) required to convict a defendant of attempted murder.  (*Ibid.*)  The California Supreme Court has explained:  "[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice. That the shooter had no particular motive for shooting the victim is not dispositive, although …, where motive is shown, such evidence will usually be probative of proof of intent to kill.  Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive — the very act of firing a weapon "'in a manner that could have inflicted a mortal wound had the bullet been on target"' is sufficient to support an inference of intent to kill.  [Citation.]" (*Id*. at p. 742.)  "[E]ven if the shooting was not premeditated, with the shooter merely perceiving the victim as 'a momentary obstacle or annoyance,' the shooter's purposeful 'use of a lethal weapon with lethal force' against the victim, if otherwise legally unexcused, will itself give rise to an inference of intent to kill. [Citation.]" (*Ibid.*)

"'Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact. While reasonable minds may differ on the resolution of that issue, our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citations.]' [Citation.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1552.)

Defendant was convicted of attempting to murder Eulalia and Juan. The evidence adduced at trial is set forth at length, *ante*, and we need not repeat it here. We note, however, that Acosta told Gray she saw defendant shooting between cars *at* the victims. Arceli told Gray defendant was shooting *at* people and "just missing." Esmeralda told Federico that defendant shot at Juan. Eulalia testified that when she lifted her head after looking at the bodies, she heard Maria Nativad say to kill the mother. Eulalia looked up again, saw defendant point the gun at her, and turned to the left. He then shot at her. She lifted her head again to look at him and she turned again, and he shot at her again and the shot passed by her, between her shoulder and her ear. Eulalia estimated that when defendant fired, he was about five or six feet from her. He then pointed the gun at Juan's head, but the police arrived at that moment. Juan testified that he was face down in the middle of the street when he heard shots and then a boom, and as he was getting up, he looked up and saw someone (which other evidence showed was defendant) pointing a gun at him. He looked the other way, heard a bang, and thought he was hit, but he was not. He did not recall if defendant fired at him, but defendant was shooting toward all the people who were at Jose's house. Balladares testified that the person he saw with the weapon was close to Eulalia and Juan, and that, although Balladares did not see him shoot anybody at that point, the gun was pointing at their heads.

The foregoing evidence clearly is sufficient to permit a rational trier of fact to conclude defendant specifically intended to kill Eulalia and Juan. Defendant argues, however, that the "weight of the testimonial evidence" is that he was firing wildly, without any particular aim. The record contains evidence supporting such a scenario, or

23.

at least supporting the notion defendant was firing randomly into the crowd associated with the Mendezes. However, "[o]ur task is not to determine, for example, whether the *weight* of the evidence might favor [a lesser verdict] for either or both victims. Our task is to determine whether there was *sufficient* evidence by which a rational jury could decide" defendant harbored a specific intent to kill both victims. (*People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1111.)

The California Supreme Court has determined that a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. "An indiscriminate would-be killer is just as culpable as one who targets a specific person." (*People v. Stone, supra,* 46 Cal.4th at p. 140.) Moreover, even if defendant was firing wildly at times, this does not mean he did not harbor a specific intent to kill particular named individuals. The evidence to which defendant now points was before the jury — as was the evidence supporting a finding he specifically intended to kill Eulalia and Juan. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1218-1219; *People v. Jackson* (1989) 49 Cal.3d 1170, 1201.)

"'[A]ppellants often mistakenly assume that, if the evidence against the judgment greatly preponderates, a reversal is proper because of the absence of a *substantial conflict*. [¶] The test, however, is not whether there is substantial conflict, but rather whether there is *substantial evidence in favor of the respondent*. If this "substantial" evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment will be affirmed.… "Of course, all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." [Citations.]' [Citation.]" (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the

exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

The evidence here was clearly sufficient to support a finding of intent to kill. Eulalia testified that she perceived the bullet, which was fired from mere feet away, going past her head and neck area. This bullet easily could have inflicted a mortal wound had defendant's marksmanship been better. (Cf. *People v. Ramos* (2011) 193 Cal.App.4th 43, 48.) Although it is unclear whether defendant actually fired at Juan, the jury reasonably could have concluded defendant was preparing to inflict what he intended to be a fatal shot, when the fortuitous arrival of the police stayed his hand. (Cf. *People v. Nelson* (2011) 51 Cal.4th 198, 212-213.) "'[T]he law of attempts would be largely without function if it could not be invoked until the trigger was pulled .…'" (*Id*. at p. 212.)

Defendant is seeking to have us reweigh the evidence. That is not our function. Substantial evidence supports the attempted murder convictions.

**B.** **Premeditation and Deliberation**

In order to sustain a verdict of first degree murder on a theory of deliberation and premeditation, more must be shown than an intent to kill. (*People v. Harris* (2008) 43 Cal.4th 1269, 1286.)**31** "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 767; accord, *People v. Jurado* (2006) 38 Cal.4th 72, 118.) Thus, "[a]n intentional killing is premeditated and deliberate

---

**31** Although the pertinent cases most often involve murder, the legal principles are equally applicable to the question whether an attempted murder was premeditated and deliberate. (See, e.g., *People v. Gonzalez* (2012) 54 Cal.4th 643, 663-664; *People v. Lenart, supra,* 32 Cal.4th at p. 1127.)

if it occurred as the result of reflection rather than unconsidered or rash impulse. [Citations.] However, the requisite reflection need not span a specific or extended period of time. Thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly. [Citations.]" (*People v. Nelson, supra,* 51 Cal.4th at p. 213.) "Evidence concerning motive, planning, and the manner of killing are pertinent to the determination of premeditation and deliberation, but these factors are not exclusive nor are they invariably determinative. [Citation.]" (*People v. Silva* (2001) 25 Cal.4th 345, 368.) Rather, they are merely a framework for appellate review, and need not be present in any particular combination or afforded special weight. (*People v. Brady* (2010) 50 Cal.4th 547, 562.)

Evidence adduced at trial showed a strong motive for both the murders and the attempted murders, specifically the bad blood between the Mendez and Salas families. Although perhaps not the primary instigator, defendant was an active participant in previous conflicts between family members. The evidence was also conducive to a rational trier of fact finding: Esmeralda overheard defendant and Fabian telephoning people to come over in anticipation of trouble with those attending the Mendez barbecue, and that the Salas family brought guns to the house the day of the shooting; defendant surreptitiously obtained the gun used in the shooting beforehand, specifically with a view to using it against the Mendezes; defendant retrieved the gun from his or his parents' house before he opened fire; and defendant continued to shoot despite Juan urging him to stop and fight without guns. A rational trier of fact further could have found — with respect both to the murders and the attempted murders — that the gun was deliberately aimed at the victims' heads from a distance close enough to produce a mortal wound, either when the victims were not looking at the shooter (in the case of Jose and Pablo) or

26.

when they were in a position of disadvantage vis-à-vis defendant because they were trying to assist other victims or were on the ground (in the case of Eulalia and Juan).**32**

"[T]hough the evidence is … not overwhelming, it is sufficient to sustain the jury's finding [of premeditation and deliberation]." (*People v. Perez* (1992) 2 Cal.4th 1117, 1127; see, e.g., *People v. Gonzalez, supra,* 54 Cal.4th at p. 664 [sufficient evidence of premeditation and deliberation where defendant planned to attack victim when victim was especially vulnerable, in part because victim did not expect confrontation, and defendant brought loaded rifle to ambush site; defendant had motive to kill victim because of victim's conflict with defendant's brother; when victim fought off initial knife attack, defendant escalated the violence by handing accomplice a loaded, cocked rifle]; *People v. Nelson, supra,* 51 Cal.4th at p. 213 [same; defendant "had ample time to premeditate and deliberate" when he took up firearm, climbed out of moving car, sat on window frame, reached across roof, braced himself, and aimed at victim]; *People v. Manriquez* (2005) 37 Cal.4th 547, 577 [same; defendant and victim were engaged in verbal altercation; several minutes elapsed, then defendant approached victim, pulled firearm from waistband, cocked weapon, and fired several shots to victim's head, neck, and chest areas]; *People v. Memro* (1995) 11 Cal.4th 786, 863 [same; defendant had to run from first victim's position to second victim's position, and cut second victim's throat from behind; rational jury could have concluded he "intended death and no other result" and considered options as he ran toward second victim]; *People v. Miranda* (1987) 44 Cal.3d 57, 87 [same; fact defendant brought loaded gun into store and shortly after used it to kill unarmed victim reasonably suggested defendant considered possibility of murder

---

**32** Jurors could have accepted defendant's testimony that he was the only shooter, while disbelieving the portion of his testimony that was self-serving, particularly that he was in fear Fabian would be killed. (See *People v. Silva, supra,* 25 Cal.4th at p. 369.) If jurors believed Antonio shot Jose and Pablo, they still could reasonably have found defendant acted with premeditation and deliberation.

in advance], disapproved on another ground in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.)  Accordingly, defendant is not entitled to reversal of the jury's findings that he acted with premeditation and deliberation.

## II

### CONSTITUTIONAL RELIABILITY OF HOMICIDE VERDICTS

With respect to the homicides, the prosecutor proceeded on the theory that Antonio was the actual shooter and defendant aided and abetted him in the murders. There was evidence to support this theory.  The defense proceeded on the theory defendant acted alone, with the killings either being justified because they were committed in defense of a family member or constituting no more than voluntary manslaughter.  There was evidence to support the theory defendant was the actual shooter and Antonio was not involved in the homicides.

Jurors were told a person is guilty of a crime whether he or she committed it personally, or aided and abetted the perpetrator, and they were instructed on all applicable theories of liability with respect to defendant.  They were not told the direct perpetration instructions applied only to Antonio and the aiding and abetting instructions only to defendant.  Rather, they were told that, with specified exceptions not pertinent here, all instructions applied to each trial defendant.[33]  Jurors deadlocked on all charges against Antonio, and the trial court declared a mistrial as to him.  The court subsequently

---

[33]    Jurors were also told that some instructions might not apply, depending on their findings about the facts of the case; to separately consider the evidence as it applied to each defendant and decide each charge for each defendant separately; and that they could believe all, part, or none of any witness's testimony.  They were also told that as to defendant, they would be given verdict forms, for each count charging murder, for guilty of first degree murder, guilty of second degree murder, guilty of voluntary manslaughter, and not guilty.  As to Antonio, however, they would be given verdict forms, for each count charging murder, for guilty of first degree murder, guilty of second degree murder, and not guilty.  (Antonio expressly requested that the court not give voluntary manslaughter instructions as to him, and the court acquiesced in his request.)

accepted verdicts with respect to defendant; as previously described, the jury found him guilty of first degree murder for both homicides.

Defendant now contends the deadlock as to Antonio rendered the homicide verdicts unreliable as to defendant. He says that "[o]nce the deadlock was declared, aiding and abetting was no longer a proper theory of liability as to [defendant]"; hence, the trial court should have refused the verdicts (or defense counsel should have requested that it do so), corrected the jury instructions by removing aiding and abetting liability from the jury's consideration, and directed the jury to deliberate under the corrected instructions, pursuant to which defendant could be convicted, if at all, only as a direct perpetrator. He reasons: "[I]f there was no homicide committed by Antonio, there was no predicate act committed by Antonio and, hence, [defendant] could not have aided and abetted Antonio. [¶] Under these unique circumstances, the identity of the shooter was imperative for purposes of the verdict and, given the jury's inability to agree that Antonio was the shooter …, it logically could not have agreed that [defendant] was guilty of the homicides on a theory of aider and abettor liability. Consequently, … it was incumbent upon either the trial court or defense counsel to insure that aider and abettor liability was withdrawn from the jury's consideration for purposes of a verdict consistent with the requirements of federal due process."

When the state participates in the deprivation of personal liberty, due process requires procedures necessary to ensure reliability in the fact-finding process. (*People v. Geiger* (1984) 35 Cal.3d 510, 520, overruled on another ground in *People v. Birks* (1998) 19 Cal.4th 108, 136; see, e.g., *Ford v. Wainwright* (1986) 477 U.S. 399, 411; *People v. Mincey* (1992) 2 Cal.4th 408, 445.) Inconsistent verdicts — whether on separate charges against one defendant or with respect to codefendants in a joint trial — are not rendered unreliable, or otherwise infirm, by virtue of their inconsistency. (See, e.g., *Harris v. Rivera* (1981) 454 U.S. 339, 345 & fns. 13 & 14; *People v. Thompson* (2010) 49 Cal.4th 79, 119-120; *People v. Avila* (2006) 38 Cal.4th 491, 600; *People v. Palmer* (2001) 24

29.

Cal.4th 856, 860-861.)  Moreover, although the jury must unanimously agree the defendant is guilty of a specific crime (*People v. Russo* (2001) 25 Cal.4th 1124, 1132), "'as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, [the jury] need not decide unanimously by which theory he is guilty.  [Citations.]  More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator.  [Citations.]  This rule of state law passes federal constitutional muster.  [Citation.]'  [Citation.]"  (*People v. Majors* (1998) 18 Cal.4th 385, 408; accord, *People v. Lewis* (2001) 25 Cal.4th 610, 654; see *Schad v. Arizona* (1991) 501 U.S. 624, 630-632 (plur. opn. of Souter, J.); *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1376.)  "Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt.  Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what.  There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other."  (*People v. Santamaria* (1994) 8 Cal.4th 903, 919.)

In the present case, the evidence adduced at trial unambiguously imposed on the trial court a sua sponte duty "to instruct on aiding and abetting liability as a general legal principle raised by the evidence and necessary for the jury's understanding of the case.  [Citation.]"  (*People v. Delgado* (2013) 56 Cal.4th 480, 483.)  "Even without a request, a trial court is obliged to instruct on "'general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case'" [citation], or put more concisely, on "'general legal principles raised by the evidence and necessary for the jury's understanding of the case'" [citation].  In particular, instructions delineating an aiding and abetting theory of liability must be given when such derivative culpability 'form[s] a part of the prosecution's theory

30.

of criminal liability and substantial evidence supports the theory.' [Citation.]" (*Id*. at p. 488.) As explained above, substantial evidence supported the theory defendant was not the actual shooter where Jose and Pablo were concerned, and the prosecutor relied on such a complicity theory. Accordingly, "[a]ccomplice liability for the [homicides] was thus a theory raised by the evidence and necessary for the jury's full understanding of the case; the court [would have] erred in not instructing on this theory. [Citation.]" (*Ibid*.)

Section 1161 provides, in pertinent part: "When there is a verdict of conviction, in which it appears to the Court that the jury have mistaken the law, the Court may explain the reason for that opinion and direct the jury to reconsider their verdict .…" Apart from this limited circumstance, "a trial court may not decline to accept a jury verdict, or refuse to hear the verdict, simply because it is inconsistent with another verdict rendered by the same jury in the same case." (*People v. Carbajal* (2013) 56 Cal.4th 521, 532-533; see *People v. Scott* (1960) 53 Cal.2d 558, 561-562, disapproved on another ground in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2, 648-649.)[34] There was no suggestion here the jury mistook the law.

Nor did the jury's deadlock as to Antonio somehow transform aiding and abetting into an improper theory as to defendant. Jurors were not constrained by the fact the prosecution chose to focus on a particular theory. (*People v. Barton* (1995) 12 Cal.4th 186, 203; see *People v. Alexander* (2010) 49 Cal.4th 846, 921.) The jury unanimously found defendant guilty, beyond a reasonable doubt, of murdering Jose and Pablo. It does not matter whether, in so finding, any individual juror believed defendant guilty as the direct perpetrator or as an aider and abettor, or that the juror could not decide exactly

---

[34] We recognize no true "verdict" was returned with respect to Antonio, but find this immaterial since it is the verdicts returned as to defendant that defendant says should have been rejected. Just as a verdict of acquittal may be inconsistent with a verdict of guilty, so too may a jury's deadlock. (See *People v. Nieves* (1969) 2 Cal.App.3d 562, 567.)

what defendant did but was convinced of defendant's guilt. That jurors could not agree on whether Antonio was culpable does not change this or render their verdicts unreliable as to defendant.

Defendant quotes *People v. Perez* (2005) 35 Cal.4th 1219 (*Perez*), in which the California Supreme Court said: "[Section 31] extends criminal liability as principals in a crime to '[a]ll persons concerned in the commission of a crime,' and all those who 'aid and abet in its commission.' As this language makes plain, the commission of a crime is a prerequisite for criminal liability. If the defendant himself commits the offense, he is guilty as a direct perpetrator. If he assists another, he is guilty as an aider and abettor. *It follows, therefore, that for a defendant to be found guilty under an aiding and abetting theory, someone other than the defendant must be proven to have attempted or committed a crime*; i.e., absent proof of a predicate offense, conviction on an aiding and abetting theory cannot be sustained." (*Id*. at p. 1225, italics added.) Defendant says it is likely he was convicted on an aiding and abetting theory without a predicate offense, because the prosecutor was unable to prove to 12 people, beyond a reasonable doubt, that Antonio was the shooter. Defendant says this deadlock meant the following: "Without proof of a criminal act by Antonio to which [defendant] contributed, the prosecution could not convict [defendant] as an aider and abettor. [Citations.]" (*Id*. at p. 1227.)

The quotes from *Perez* must be read in context of the issues presented in that case. So read, they do not assist defendant.

In *Perez*, the defendant was arrested in possession of methamphetamine precursors, which he said he intended to sell to a man known to him as Antonio. He was charged with possessing precursors with intent to manufacture methamphetamine. The prosecutor proceeded under two theories: (1) Perez was liable as a direct perpetrator because he possessed the precursors and personally intended to manufacture methamphetamine, or, alternatively, (2) Perez was liable as an aider and abettor because

32.

he possessed the precursors with the intent to sell them to another person to be used in manufacturing methamphetamine. (*Perez*, *supra*, 35 Cal.4th at pp. 1223-1224.)

The high court first considered whether a person could be guilty of aiding and abetting absent proof of criminal conduct by *some* direct perpetrator. (*Perez*, *supra*, 35 Cal.4th at p. 1225.) It was in this context that the court stated someone other than the defendant had to be proven to have attempted or committed a crime before the defendant could be convicted on an aiding and abetting theory. (*Ibid*.) The court observed that the prosecutor had persuaded the trial court to give aiding and abetting instructions despite the absence of proof of either a completed crime or an attempt, with the People arguing that by intending to sell the precursors to Antonio, Perez aided and abetted Antonio's manufacture of methamphetamine. (*Id*. at p. 1227.) The Supreme Court held the trial court erred in instructing on aiding and abetting: "Whether the theory was that Perez intended to aid and abet Antonio's actual manufacture of methamphetamine … or to aid and abet Antonio's possession of hydriodic acid precursors with the intent to manufacture methamphetamine …, no *evidence* established that Antonio ever violated, or attempted to violate, either statute. Without proof of a criminal act by Antonio to which Perez contributed, the prosecution could not convict Perez as an aider and abettor. [Citations.]" (*Ibid*., italics added.) The court held that *under the facts of the case*, "Perez could be convicted as a direct perpetrator or not at all." (*Ibid*.)[35]

In its discussion of prejudice, the California Supreme Court observed: "[T]he trial was infected by a pair of related errors. First, the trial court gave instructions on aiding and abetting when no proof of an essential element, an attempted or completed crime by a second party, had been *introduced*. Second, the trial court prevented defense counsel from arguing that this omission was fatal — that aiding and abetting in fact required

---

[35]     The court went on to determine Perez could not be convicted as a direct perpetrator. (*Perez*, *supra*, 35 Cal.4th at pp. 1227-1231.)

33.

proof of an independent crime — and overruled the defense's objection to prosecution argument that omitted this element." (*Perez, supra*, 35 Cal.4th at p. 1232, italics added.) The foregoing makes it clear our state's high court was not addressing a situation such as confronts us in defendant's case, and was in no way suggesting the prosecution's failure to prove beyond a reasonable doubt that a second party committed a crime had, in essence, the retroactive effect of rendering erroneous an aiding and abetting theory in the first instance. In the present case, unlike in *Perez*, the evidence left no doubt whatsoever that *someone* committed a crime (once the jury rejected the justification defense). Contrary to the situation in *Perez*, if a juror here believed Antonio was the shooter — a scenario supported by substantial evidence — the evidence and instructions allowed him or her to convict defendant as Antonio's aider and abettor. If the juror did not believe the prosecutor proved Antonio's involvement beyond a reasonable doubt, the evidence and instructions allowed him or her to convict defendant as the direct perpetrator. The evidence and instructions did *not* permit the juror to convict defendant as an aider and abettor of a person not shown to have committed a crime.

For the trial court to have refused the verdicts on the homicide counts and instructed the jury to deliberate anew on the theory defendant could only be convicted as the direct perpetrator, would have given defendant a windfall to which he was not entitled. It would have had the effect of requiring juror unanimity on theory, when the law does not require such unanimity.[36] "'"The fact that certain defendants may escape

---

[36] It appears the jury found defendant to be a direct perpetrator in any event, since jurors necessarily unanimously determined, in finding true the firearm enhancements pursuant to section 12022.53, subdivision (c), that defendant personally and intentionally discharged a firearm in the commission of both murders. The uncontradicted evidence showed (as we have previously noted) that only one gun (aside from Balladares's shotgun) was fired in the incident. Thus, were we to find error in allowing the jury to consider an aiding and abetting theory, we would conclude it was harmless. (See, e.g., *People v. Chun* (2009) 45 Cal.4th 1172, 1203-1205; *People v. Wilson* (2008) 44 Cal.4th 758, 801-802; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129-1130.)

conviction for their crimes is not any legal or logical reason why another defendant, where substantial evidence has been introduced to sustain his conviction, should be exonerated and be permitted to escape punishment for his crime.' [Citation.]" (*People v. Palmer, supra,* 24 Cal.4th at p. 861.)

In light of our conclusion, defendant's alternative claim — that, if the trial court had no sua sponte obligation to take corrective action, then defense counsel was ineffective for not doing so — fails. Defendant can show neither deficient performance nor prejudice, both of which he would have to establish in order to prevail on this claim. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; *People v. Pope* (1979) 23 Cal.3d 412, 425; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

## **DISPOSITION**

The judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
KANE, J.